## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JiffyShirts.com, (US) L.P. *et al.*, | ) | |
| | ) | Case No. 2:25-cv-05316-RBS |
| Plaintiffs, | ) | |
| | ) | Judge R. Barclay Surrick |
| vs. | ) | |
| | ) | |
| Ninja Transfers, LLC *et al.*, | ) | Jury Trial Demanded |
| | ) | |
| Defendants. | ) | |

### First Amended Complaint

For its amended complaint against defendants Ninja Transfers, LLC ("Ninja") and Michael Nemeroff (collectively, "Defendants"), plaintiffs JiffyShirts.com, (US) L.P. and Shirts S&D Management LLC (collectively, "Jiffy") state:

### Summary of Case

1.      Jiffy is a market leader in the online t-shirt and blank apparel industry, operates a website and online store at *Jiffy.com*, and sells its goods and services under various JIFFY trademarks, to which Jiffy owns the exclusive rights.

2.      Ninja is a Jiffy competitor; it sells t-shirts, blank apparel, and printing services online on its website and online store at *NinjaTransfers.com*.

3.      Nemeroff is the CEO of Ninja, he derives money from Ninja, and, upon information and belief, he is the founder and owner of Ninja.

4.      Jiffy recently learned that Nemeroff and Ninja registered at least two domain names that incorporate the JIFFY mark, *JiffyBlank.com* and *JiffyBlanks.com* (the "infringing domains"), and redirected those domain names to Ninja's online store at *NinjaTransfers.com*.

5. By doing so, Nemeroff and Ninja intentionally sought to deceive and confuse customers into believing that Jiffy and Ninja are the same or related and to redirect customers looking for Jiffy's goods or services to Ninja's website.

6. Defendants' actions infringe Jiffy's trademark rights and constitute cyberpiracy under the Lanham Act.

7. Jiffy sues to end Defendants' cyberpiracy and infringement, to protect customers from deception, to protect Jiffy's reputation and goodwill, and to obtain the relief and compensation to which Jiffy is entitled by law.

## The Parties

8. Plaintiff Shirts S&D Management LLC, is a Delaware limited liability company with a principal place of business in Delaware.

9. Plaintiff JiffyShirts.com, (US) L.P. is a Delaware limited partnership with a principal place of business in Delaware.

10. Defendant Ninja Transfers, LLC is a Pennsylvania limited liability company with a principal place of business in Philadelphia, Pennsylvania.

11. Defendant Michael Nemeroff is an individual, who, upon information and belief, is a citizen and resident of Pennsylvania.

## Jurisdiction and Venue

12. This Court has subject matter jurisdiction over Jiffy's Lanham Act claims under 15 U.S.C. § 1121(a) and under 28 U.S.C. § 1331 because they arise under federal law.

13. This Court also has diversity jurisdiction over this civil action under 28 U.S.C. § 1332(a) because the parties are diverse and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

37057701.1

14.     This Court also has supplemental subject matter jurisdiction over Jiffy's state law claims under 28 U.S.C. § 1367(a) because those claims are so related to the Lanham Act claims that together the claims are part of the same case or controversy under Article III.

15.     This Court has personal jurisdiction over Defendants because, among other things, Ninja resides in Pennsylvania and Nemeroff, upon information and belief, resides in Pennsylvania; Defendants are intentionally engaging in online activities that are designed to confuse and deceive consumers all over the U.S., including individuals and businesses in Pennsylvania; they are using a deceptive scheme to offer goods and services in Pennsylvania to Pennsylvania residents through the *NinjaTransfers.com* website to which the infringing domain names redirect; they are infringing Jiffy's trademark rights in Pennsylvania at least through their infringing use of the *JiffyBlank.com* and *JiffyBlanks.com* domain names; and, upon information and belief, they are transacting business in Pennsylvania by selling goods and services to Pennsylvania individuals and businesses at least through their online store at *NinjaTransfers.com*.

16.     Venue is proper under 28 U.S.C. § 1391(b) because, upon information and belief, the Defendants reside in Pennsylvania; a substantial part of the events giving rise to the claims occurred in this judicial district at least because the infringing activity occurred in this district through the use of the infringing domain names, which targeted the entire U.S., including individuals and businesses in Pennsylvania; and Defendants are both subject to this Court's personal jurisdiction.

37057701.1

# Relevant Facts

### *Jiffy's Rights*

17.     Jiffy operates an online store at *Jiffy.com*, where it offers and sells shirts, apparel blanks, apparel transfers, and printing services for customizable apparel. Apparel blanks are plain, unprinted clothing items, such as shirts or sweatshirts, that are designed for customers to create branded or personalized clothing. Apparel transfers are pre-made designs or graphics applied to clothing, often apparel blanks, using heat, pressure, or adhesive methods.

18.     Jiffy uses a variety of JIFFY trademarks in connection with its marketing and sale of t-shirts, apparel, and related goods and services.

19.     Jiffy owns all common law and registered trademark rights to the JIFFY marks throughout the United States in connection with apparel, online sale of apparel, and related goods and services.

20.     Jiffy owns the following federally-registered trademarks that incorporate its JIFFY mark:

| Mark | Goods/Services | Reg. No. | Reg. Date |
|------|----------------|----------|-----------|
| JIFFYSHIRTS.COM | On-line wholesale and retail store services featuring clothing | 3,333,844 | Nov. 13, 2007 |
| *JIFFY SHIRTS.com* (logo) | On-line wholesale and retail store services featuring clothing | 4,604,855 | Sept. 16, 2014 |
| *JIFFY* (logo) | Apparel, namely, t-shirts, shirts, polos, sweaters, sweatshirts . . . | 6,936,999 | Dec. 27, 2022 |
| *JIFFY* (logo) | Drinkware, namely, glasses and mugs; sports bottles sold empty | 7,031,282 | Apr. 18, 2023 |

37057701.1

| | Downloadable mobile applications for viewing and ordering an online assortment of bulk blank shirts, hoodies, pants, jackets | 7,360,558 | Apr. 16, 2024 |
|---|---|---|---|
| JIFFY TRANSFERS | Digital platform to connect a network of prints for on demand printing, . . . | 7,635,993 | Dec. 31, 2024 |

21.     Jiffy owns pending trademark applications for various marks that incorporate the "Jiffy" name for apparel and related goods and services.

22.     Jiffy owns unregistered, common-law trademark rights to the JIFFY marks in connection with online wholesale and retail sales of clothing, apparel, printing services, and related goods and services.

23.     Jiffy has obtained those common-law rights through its exclusive and continuous nationwide use of the JIFFY marks as trademarks in connection with those goods and services, with such use dating back to at least 2007 and generating significant revenue from business transactions in various states.

24.     The Jiffy companies are organized such that Shirts S&D Management, LLC owns the federal registrations, and JiffyShirts.com, (US) L.P. operates the *Jiffy.com* website in the U.S.

25.     All of Jiffy's registered and common-law marks that incorporate the JIFFY mark are collectively referred to herein as the "JIFFY marks."

26.     Jiffy also has invested significant effort, money, and resources to promote and market its goods and services under the JIFFY marks, and it has obtained market penetration throughout the U.S., including in Pennsylvania.

37057701.1

27.      Jiffy is a nationwide business and does not confine its goods and services to any particular state or geographic region, nor does it exclude any state or geographic regions from its sales and marketing activities in connection with the JIFFY marks.

28.      Below is a screenshot of the Jiffy homepage at Jiffy.com, providing an example of how Jiffy uses the JIFFY mark:



29.      As a result of Jiffy's years of preexisting use of the JIFFY marks, the marks' inherent and acquired distinctiveness, sales made by Jiffy under the marks, and the high-quality products and service, customer service, and fast delivery provided under the JIFFY marks, relevant consumers associate the JIFFY marks with Jiffy and have positive views of the marks and the goods and services offered and sold under those marks.

37057701.1

30.     Indeed, Defendants' copying and use of the JIFFY mark in domain names redirected to the *NinjaTransfers.com* website prove that it is a distinctive and valuable mark that consumers recognize and prefer. Otherwise, there would be no reason for Defendants to copy and use the JIFFY mark in the infringing domain names.

### ***Defendants' Wrongful Acts***

31.     Jiffy recently learned that Defendants registered the *JiffyBlank.com* and *JiffyBlanks.com* domain names and were redirecting them to the *NinjaTransfers.com* website, such that anyone who types either domain name into a web browser, such as Google Chrome, would be brought to the *NinjaTransfers.com* website.

32.     Nemeroff is the individual that registered the infringing domain names, and he did so for Ninja, on behalf of Ninja, and for Ninja's benefit. Furthermore, any benefits enjoyed by Ninja, the company, benefit Nemeroff personally as he is the CEO and, upon information and belief, the owner of Ninja, who receives financial payments and other benefits from Ninja.

33.     Nemeroff and Ninja acted jointly with a shared intent to harm Jiffy and benefit themselves by registering and using the infringing domain names to deceive customers, to cause confusion between Ninja and Jiffy, and to divert sales intended for Jiffy to Ninja, and they both unjustly benefited from doing so.

34.     Defendants registered and used the infringing *JiffyBlank.com* and *JiffyBlanks.com* domain names, which are confusingly similar to the JIFFY marks, individually and collectively, with bad faith intent to profit from the JIFFY marks.

37057701.1

***The UDRP Action and Failed Settlement Attempts***

35.     When Shirts S&D Management LLC ("SSD") discovered the infringing domains, it instituted a Uniform Dispute Resolution Policy ("UDRP") action with the World Intellectual Property Organization ("WIPO").

36.     SSD's UDRP complaint, which sought transfer of the infringing domain names, was originally filed against GoDaddy because Nemeroff hid his identity by paying for a "proxy" service through GoDaddy.

37.     In response to the UDRP complaint, GoDaddy disclosed Nemeroff as the individual that had registered the domain names.

38.     SSD then amended its UDRP complaint to name Nemeroff as the respondent in the action.

39.     Even after the filing of the UDRP complaint by Jiffy, explaining how the use of the JIFFY mark in domain names that redirect to Ninja's website is cyberpiracy and infringement, Defendants continue to use the infringing domain names as redirects to the *NinjaTransfers.com* website and have not ceased their infringing conduct. This further demonstrates their willful infringement and cyberpiracy. Attached as Exhibit A is a true copy of screenshots obtained on September 5, 2025, which show that the *NinjaTransfers.com* website returns when a user enters each of the infringing domain names in a web browser, and the Google Chrome Developer Tools, shown on the right side of the screenshots, show that the redirects are coded and intentional.

40.     Nemeroff's attorney contacted SSD's attorney about settlement when Nemeroff learned of the UDRP complaint against him.

37057701.1

41.     SSD's attorney did not know that Nemeroff owns and controls a company, Printfly Corporation, that has a meritless trademark infringement and false advertising lawsuit currently pending against SSD and JiffyShirts.com, (US) L.P. in this Court, Case No. 2:24-cv-06367-RBS, (the "Harassment Suit"). Because the Harassment Suit lacks merit, and Printfly suffered no real harm, it is evident that Printfly filed and prosecutes the Harassment Suit with malicious intent to harm and harass a competitor: Jiffy.

42.     Indeed, in relation to the Harassment Suit, Jiffy provided Printfly with a Google analytics report confirming that the alleged trademark infringement resulted in about 18 sales, about $1,500 in revenue, and a net loss because the costs exceeded revenues for those transactions. Based on these *de minimis* sales, Jiffy made attempts, through counsel, to discuss settlement of the Harassment Suit with Printfly, but those attempts were ignored, further indicating that Printfly filed the lawsuit to harass Jiffy, run up Jiffy's attorneys' fees, and not to genuinely right a wrong.

43.     Nemeroff's attorney did not disclose and intentionally concealed the Harassment Suit from SSD's attorney, knowing that disclosing the connection between Nemeroff and the pending lawsuit would cause SSD's attorney to notify SSD, which would have alerted the attorney and client to the issue and cause them to not agree to a settlement that may release Nemeroff.

44.     Instead, Nemeroff's attorney intentionally concealed this material information, pretended this was a run-of-the-mill dispute, and hoped to slip a generic release into the agreement to try to escape a lawsuit and corresponding liability that the attorney knew would be filed if SSD management and its attorney were aware of the connection to the Harassment Suit.

37057701.1

45.     Unaware of this material fact, SSD's attorney discussed settlement with Nemeroff's attorney by phone on August 5, 2025. SSD had no prior knowledge that this phone call would occur, no prior knowledge that the parties' attorneys would discuss a possible settlement, and had not granted its attorney any authority to agree to settlement terms or to bind Jiffy to any settlement.[1]

46.     That same day, on August 5, 2025, SSD's attorney emailed Nemeroff's attorney, stating that the parties had "agreed to resolve the below UDRP Proceeding . . . by Nemeroff executing an Assignment to convey the domain names . . . and the parties executing mutual releases." SSD did not authorize its attorney to send this email, to agree to any settlement, or to agree to mutual releases as a term of any settlement.

47.     Nemeroff's attorney emailed a draft settlement agreement to SSD's attorney, who replied that it "looked good" and that he would "arrange to get signed on our side." SSD did not authorize its attorney to send that email or to approve the draft settlement agreement, SSD did not authorize its attorney to approve or agree to any settlement on its behalf, only SSD's President, Chris Serflek, had the authority to approve or authorize settlement on behalf of SSD, and Serflek did not approve the settlement or authorize SSD's attorney to agree to the draft settlement agreement.

48.     When SSD's attorney presented the proposed written settlement agreement to Serflek for signature, Serflek made the connection between Nemeroff and the Harassment Suit, and refused to approve, agree to, or sign the settlement because SSD did not want to release Nemeroff, when Nemeroff was actively harassing Jiffy with a pending meritless

---

[1] The allegations in this amended complaint concerning SSD's attorney's lack of authority are asserted without any waiver of attorney-client privilege or work-product protection.

lawsuit. While the release does not appear to release Nemeroff and Ninja from financial liability in district court for their infringement and cyberpiracy, the conduct by Nemeroff's attorney suggested that he interpreted it as doing so.

49.     On August 19, 2025, SSD's attorney notified WIPO that there was no settlement, but SSD would agree to a simple settlement of the UDRP action if Nemeroff would transfer the infringing domain names.

50.     That same day, Nemeroff's attorney responded by email that he contended there was a binding settlement based on the prior emails between the attorneys.

51.     SSD's attorney responded that there was no settlement because his client did not agree to it. He stated:

> The Settlement Agreement is NOT binding absent my client's agreement to it. I now suspect that there is something else going on with your client but there is clearly no meeting of the minds between the parties. If you send an E-mail to WIPO agreeing that they should direct conveyance by the Registrar of the subject domains to Complainant, that will end it, but WIPO should not be misled to believe that the terms of the Settlement Agreement are binding upon either party.

52.     Nemeroff appeared to reconsider when his attorney responded by email on August 19, 2025, stating that he agrees to a simple transfer of the domain names for a dismissal of the UDRP action, without any mention of releases. He stated: "I am expressly giving authority to the WIPO, on behalf of Michael Nemeroff, to transfer the domains to the Claimant to end the parties' dispute."

53.     SSD's attorney then emailed WIPO that Nemeroff agreed to transfer the domain names "in return for a dismissal of the proceeding without prejudice pursuant to Paragraph 17(a)(vii) of the Rules for Uniform Domain Name Dispute Resolution Policy and agrees to submit the standard settlement form to WIPO accordingly."

54.     Nemeroff's attorney was copied on that email, and he did not object to it or disagree with counsel's statements.

55.     Thus, regardless of what had happened between the parties' attorneys previously, the parties appeared to have a simple settlement agreement: transfer of the domain names in return for a "without prejudice" dismissal and no releases.

56.     On September 3, 2025, SSD's attorney emailed Nemeroff's attorney WIPO's "Standard Settlement Form" signed by SSD and requested Nemeroff's signature.

57.     Because the WIPO form requires the parties to "summarize the essential terms of the Parties' separate settlement agreement for purposes of Registrar action," the signed settlement form described the settlement as being "without prejudice" and with "no releases of liability." It stated:

> In accordance with Paragraph 17(a)(vii) of the Rules, the Parties' settlement agreement is without prejudice, the settlement resolves only the issue of transfer of the domain names and provides no releases of liability.

58.     On September 3, 2025, Nemeroff signed the Standard Settlement Form as presented without any markups or qualifications, thus agreeing that there was a settlement to dismiss the UDRP action without prejudice, that the agreement only resolved the transfer of domain names issue, and it provided no releases of liability.

59.     However, the email by which Nemeroff's attorney sent the signed form to SSD's attorney directly contradicted his client's signed agreement. Nemeroff's attorney asserted that the draft proposed settlement agreement that his client signed on August 5—and which SSD refused to sign—was binding. These positions are irreconcilable because the proposed agreement (unexecuted by SSD) contains terms materially different from what is described on the Standard Settlement Form signed by Nemeroff and SSD.

37057701.1

60.     SSD's attorney responded that the email statements "directly contradict your client's signature on the attached settlement form," and the "conflicting positions are irreconcilable, and confirm that we do not have a settlement due to a lack of meeting of the minds." SSD's attorney further advised that he would notify WIPO that there is no settlement.

### *WIPO Declares No Settlement Occurred and Rules for SSD*

61.     On September 5, 2025, Nemeroff's attorney emailed SSD's attorney, copying WIPO, alleging that the parties reached a binding settlement to resolve the UDRP proceeding.

62.     On September 17, 2025, SSD's attorney advised WIPO that SSD had filed this district court civil action and requested that WIPO suspend the UDRP proceeding in light of that filing.

63.     On September 22, 2025, WIPO responded that the "Parties have not completed a settlement process as per paragraph 17 of the Rules," advised that SSD could request "termination" of the proceeding, Nemeroff may respond to such a termination request, and any further request to terminate or suspend must be submitted to the WIPO Panel after it is assigned.

64.     In response to WIPO's email, SSD requested a termination "without prejudice, as if it was never commenced," and Nemeroff responded that the case should be "terminated with prejudice, pursuant to the parties settlement agreement and my client executing all documents necessary to transfer the domains to claimant."

65.     WIPO responded on October 2, 2025, that, because "no settlement has been reached" and Nemeroff objected to a termination without prejudice, "the case will proceed to panel appointment."

37057701.1

66.     After the Panel was appointed, SSD again requested that that UDRP proceeding be terminated or suspended in light of this action.

67.     On October 27, 2025, the WIPO Panel declined to terminate or suspend the action and issued its Administrative Panel Decision in SSD's favor. The Panel ruled that: (a) the infringing domain names were each confusingly similar to the JIFFYSHIRTS.COM mark, (b) Nemeroff had no rights or legitimate interests to the infringing domain names, and (c) Nemeroff registered and used the infringing domain names in bad faith. A true copy of this decision is attached as Exhibit B.

68.     The WIPO Panel further ordered that the infringing domain names be transferred to SSD.

69.     By proceeding to issue its ruling on the merits, after reviewing the parties' arguments and contentions regarding settlement, WIPO confirmed that there was no settlement that resolved the UDRP proceeding, and it rejected Nemeroff's arguments in favor of settlement.

### Count One
*Trademark Infringement under the Lanham Act*
*15 U.S.C. §§ 1114(1)(a) and 1125(a)(1)*

70.     Jiffy incorporates by reference all preceding allegations in this amended complaint as if fully rewritten herein.

71.     The JIFFY marks are valid and legally enforceable.

72.     Jiffy exclusively owns the JIFFY marks in connection with shirts, apparel, online retail sales of clothing, and related goods and services.

73.     The JIFFY marks are inherently distinct.

74.     The JIFFY marks also have acquired distinctiveness in the marketplace, such that those in the relevant channels of commerce readily associate the JIFFY marks with Jiffy and its goods and services.

75.     By using the JIFFY mark in the infringing domain names to redirect to its *NinjaTransfers.com* online store in connection with goods and services that compete with Jiffy, Defendants are likely to cause confusion in the minds of those in the marketplace concerning the origin, source, sponsorship, approval, and association of Defendants' goods and services, Jiffy's goods and services, or both.

76.     Defendants have infringed the JIFFY marks under the Lanham Act with willful intent.

77.     Defendants' trademark infringement has damaged Jiffy and caused it irreparable harm, which will continue unless Defendants' unlawful conduct is enjoined by this Court.

**Count Two**
*Cyberpiracy under the Lanham Act*
*15 U.S.C. § 1125(d)*

78.     Jiffy incorporates by reference all allegations in all preceding paragraphs of this amended complaint as if fully rewritten herein.

79.     The infringing domain names are confusingly similar to the JIFFY marks.

80.     The Defendants registered and used the infringing domain names with bad faith intent to profit from the JIFFY marks at least by using the domain names to deceive customers and to redirect them from Jiffy to their *NinjaTransfers.com* online store.

81.     As a direct and proximate result of Defendants' unlawful registration and use of the infringing domain names, Jiffy has been damaged in an amount to be determined at trial.

82.     As a direct and proximate result of Defendants' unlawful registration and use of the infringing domain names, Jiffy has suffered, and will continue to suffer, irreparable harm.

## Count Three
### *Unfair Competition*

83.     Jiffy incorporates by reference all preceding allegations in this amended complaint as if fully rewritten herein.

84.     Defendants' unlawful activities, as described above, are unfair competition under the Lanham Act, 15 U.S.C. § 1125, and under the common law of Pennsylvania and any other applicable state law.

85.     Defendants' unfair competition has damaged Jiffy and caused it irreparable harm, which will continue unless Defendants' unlawful conduct is enjoined by this Court.

## Count Four
### *Unjust Enrichment*

86.     Jiffy incorporates by reference all preceding allegations in this amended complaint as if fully rewritten herein.

87.     Through its unlawful activities, as described above, Defendants have received and retained benefits, including goodwill, that rightfully belong to Jiffy.

88.     Defendants have not compensated Jiffy for the benefits that Defendants wrongfully obtained, despite justice and equity requiring them to do so.

89.     Defendants have unjustly enriched themselves by obtaining and retaining the ill-gotten benefits of their unlawful activities, which is unjust and inequitable under the circumstances.

90.     Defendants' receipt and retention of the benefits of its unlawful activities is unjust enrichment under the common law of Pennsylvania and any other applicable state law.

37057701.1

91.     Defendants' unjust enrichment has damaged Jiffy and caused it irreparable harm, which will continue unless Jiffy's unlawful conduct is enjoined by this Court.

**Count Five**
*Civil Conspiracy*

92.     Jiffy incorporates by reference all preceding allegations in this amended complaint as if fully rewritten herein.

93.     Nemeroff and Ninja maliciously combined to intentionally cause injury to Jiffy and to unjustly enrich themselves by agreeing to work together to commit the wrongful acts detailed above.

94.     Because Defendants participated in a civil conspiracy against Jiffy, they are each liable, jointly and severally, for each cause of action, under the common law of Pennsylvania and any other applicable state law, as if it had committed all of the wrongful acts itself.

***Count Six***
*Declaratory Relief*
*(No Binding Settlement Barring This Action)*

95.     Jiffy incorporates by reference all preceding allegations in this amended complaint as if fully rewritten herein.

96.     Nemeroff and Ninja incorrectly contend that there is a binding settlement between Nemeroff and SSD that bars this lawsuit.

97.     There is no binding settlement that would bar this lawsuit for at least these reasons: (a) SSD never agreed to, approved, or authorized its attorney to agree to the settlement terms that were discussed between the parties' attorneys by email and phone between August 5 and 8, 2025; (b) SSD never signed the proposed settlement agreement provided by Nemeroff's attorney, and a signature is required under these circumstances at least because: (i) Paragraph 17 of the Rules for Uniform Domain Name Dispute Resolution

17

Policy requires a signed settlement form to dismiss a UDRP action, and the only form signed by both parties describes a settlement materially different from the proposed agreement that SSD did not sign, and (ii) New York law, namely NY CPLR § 2104, under which SSD's New York attorney was operating, mandates that settlements are not binding unless signed; (c) WIPO decided that there was no settlement that resolved the UDRP proceeding, refused to dismiss the case as settled, and proceeded to rule on the merits; (d) there was no meeting of the minds on all material terms, and Nemeroff's counsel intentionally and fraudulently concealed from SSD's attorney the material fact about Printfly's pending lawsuit against Jiffy and Nemeroff's ownership and control of Printfly; (e) any prior purported settlement was superseded when Nemeroff agreed to a simple settlement with no releases by signing the WIPO Standard Settlement Form; and (f) even the proposed settlement that Nemeroff incorrectly contends is binding, which is not binding, does not release Nemeroff and Ninja from liability against financial liability for the claims asserted herein.

98.     There is a substantial controversy between the parties, which have adverse legal interests, regarding the issue of whether a binding settlement exists and whether it bars any of the claims asserted herein.

99.     The dispute between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

100.    In accordance with the Declaratory Judgment Act, 28 U.S.C. § 2201, Jiffy requests that the Court declare that no binding settlement bars any of the claims asserted herein.

37057701.1

## Prayer for Relief

**WHEREFORE**, Jiffy prays for judgment against Defendants as follows:

(A)     Compensatory damages in an amount to be determined at trial.

(B)     An accounting and disgorgement of Defendants' ill-gotten profits.

(C)     Statutory damages under the Lanham Act.

(D)     Punitive, treble, and/or exemplary damages.

(E)     Attorneys' fees and litigation expenses.

(F)     Pre-judgment and post-judgment interest.

(G)     Costs of the action.

(H)     Preliminary and permanent injunctive relief, barring Defendants and others from: (i) using any of the JIFFY marks or anything confusingly similar to them in commerce, in a domain name, as a business name, or in any other manner that is likely to cause consumer confusion; and (ii) committing any of the other wrongful acts cited in this amended complaint.

(I)     An order forfeiting and cancelling Defendants' registration of the *JiffyBlank.com* and *JiffyBlanks.com* domain names and transferring them to Jiffy, to the extent a transfer does not occur in satisfaction of the WIPO UDRP decision.

(J)     Such other and further relief as allowed at law or in equity that the Court deems to be appropriate and to which Jiffy is entitled.

37057701.1

Dated: October 31, 2025

    s/ Matthew J. Cavanagh
Matthew J. Cavanagh (OH 0079522)
(admitted *pro hac vice*)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
t 216.348.5400 │ f 216.348.5474
mcavanagh@mcdonaldhopkins.com

and

Alexander R. Bilus (PA 203680)
Ashley N. Campbell (PA 334029)
SAUL EWING LLP
Centre Square West
1500 Market St., 38th Floor
Philadelphia, PA 19102
t 215.972.7177 | f 215.972.4166
alexander.bilus@saul.com
ashley.campbell@saul.com

*Counsel for Plaintiffs*

37057701.1

**Jury Demand**

Plaintiffs hereby demand a jury trial for all issues so triable.


Dated:   October 31, 2025

_s/ Matthew J. Cavanagh_
*Counsel for Plaintiffs*

37057701.1

**<ins>Certificate of Service</ins>**

I hereby certify that, on October 31, 2025, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which automatically serves all parties of record.


   s/ Matthew J. Cavanagh

*Counsel for Plaintiffs*